**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MICHAEL L. JORDAN,

      Plaintiff,

vs.                                CASE NO. 3:08-cv-1072-J-TEM

MICHAEL J. ASTRUE,
Commissioner of
Social Security,

      Defendant.

_____

## ORDER AND OPINION

This matter is before the Court on Plaintiff's complaint (Doc. #1), which seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") disability payments. Plaintiff did not file a Memorandum in Opposition to the Commissioner's Decision (Doc. #15); however, his complaint contains sufficient detail to understand his arguments on appeal; therefore, it shall be construed as his legal memorandum in support of his complaint (*see* Doc. #22, Order). Defendant has filed his memorandum in support of the Commissioner's decision (Doc. #23).[1] Both parties have consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by an Order of Reference, dated

_____

[1]Hereafter, the Court will identify Plaintiff's complaint as "P's Brief" and Defendant's brief as "D's Brief."

November 23, 2009 (Docs. #20, #21).  The Commissioner has filed the transcript of the underlying administrative record and proceedings.[2]

The Court has reviewed the record and has given it due consideration in its entirety, including arguments presented by the parties in their pleadings and briefs and materials provided in the transcript of the underlying proceedings.  Upon review of the record, the Court found the issues raised by Plaintiff were fully briefed and determined oral argument would not benefit the Court in making its determinations.  Accordingly, the Court has decided the matter on the written record.  For the reasons set out herein, the Commissioner's decision is **AFFIRMED**.

## PROCEDURAL HISTORY

Plaintiff Michael L. Jordan filed an application for DIB and SSI on May 4, 2005, alleging disability beginning April 1, 2004 (Tr. 63-65, 360-62).[3]  Plaintiff's application was initially denied on July 6, 2005 (Tr. 33-34, 51-53, 357-59, 372-73) and upon reconsideration on February 2, 2006 (Tr. 31-32, 48-49, 354-56, 370-71).  Thereafter, Plaintiff requested a hearing (Tr. 45), which was held on March 20, 2008, before Administrative Law Judge Teresa J. Davenport (the "ALJ") (Tr. 388-431).  At the hearing, Plaintiff appeared and testified, as did vocational expert Jackson McKay (the "VE").  Following the hearing, the ALJ denied Plaintiff's applications for DIB and SSI in a decision dated May 30, 2008 (Tr. 13-21, 379-87).  The Appeals Council ("AC") denied Plaintiff's request for review, making

---

[2]Hereafter, the Court will identify the Transcript as "Tr." followed by the appropriate page number.

[3]Plaintiff also filed  previous applications for DIB and SSI on June 16, 2004, alleging disability which began on November 1, 2003 (Tr. 59-62, 368-69).  Those claims were denied on August 9, 2004 (Tr. 54-58, 363-67).  Plaintiff apparently did not seek reconsideration of those initial determinations.

the ALJ's decision the final decision of the Commissioner (Tr. 5-8). Plaintiff now appeals (Doc. #1).

## STANDARD OF REVIEW

A plaintiff is entitled to disability benefits under the Social Security Act if he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A).

For purposes of determining whether a claimant is disabled, the law and regulations governing a claim for disability benefits are identical to those governing a claim for supplemental security income benefits. *Patterson v. Bowen*, 799 F.2d 1455, 1456, n. 1 (11th Cir. 1986). The Commissioner has established a five-step sequential evaluation process for determining whether a plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. §§ 404.1520(a)(4)(i-v); 416.920(a)(4)(i-v)[4]; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. *See also Richardson v. Perales*, 402 U.S. 389, 390 (1971).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as more than a

---

[4]All references made to 20 C.F.R. will be to the 2009 edition unless otherwise specified.

3

scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560.

The Commissioner must apply the correct law and demonstrate that he has done so. While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of HHS*, 21 F.3d 1064, 1066 (11th Cir. 1994) (*citing Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the reviewing court must not re-weigh the evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the plaintiff is not disabled. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

As in all Social Security disability cases, Plaintiff bears the ultimate burden of proving disability, and is responsible for furnishing or identifying medical and other evidence regarding his or her impairments. *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936

F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987);

42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless

he [or she] furnishes such medical and other evidence of the existence thereof as the

Commissioner of Social Security may require"). It is a plaintiff's burden to provide the

relevant medical and other evidence that he or she believes will prove disabling physical

or mental functional limitations. 20 C.F.R. §§ 404.1512(c); 416.912(c).

## ANALYSIS

### *Factual Background and Testimony*

Plaintiff was born on December 24, 1964, making him forty-three years old at the

time of the hearing (Tr. 387). Plaintiff alleges a disability onset date of April 1, 2004 (Tr.

56). In his Disability Report– Adult, Plaintiff describes his debilitating conditions as:

"herniated disc, pinched nerve, progressive" (Tr. 148). He indicated his past job experience

included loading and unloading freight by using a fork lift (Tr. 149). He reported that he has

not worked since October 12, 2003 (Tr. 148).

Prior to the hearing, Plaintiff had appointed Joseph T. Lander, an attorney, to

represent him in this matter (Tr. 46). A Ms. Byrd, however, appeared with Plaintiff at the

hearing as a representative of the law firm (Tr. 388-92).[5]

Plaintiff testified he began having back pain that started to slowly get worse,

although he does not know any particular incident that caused it (Tr. 395). The onset date

---

[5]Although the transcript refers to Ms. Byrd as an attorney, Plaintiff states in his complaint that the law firm sent a "non-attorney representative" (Doc. #1 at 2). Plaintiff states in the complaint that he did not learn the firm had sent a non-attorney until at the hearing, but did not voice objection because he did not want a postponement. Ms. Byrd advised the ALJ that she had no objections to the exhibits, and noted she would be obtaining some additional records after the hearing (Tr. 392). In addition, Ms. Byrd asked some questions of the Plaintiff during the hearing (Tr. 420-422).

was the date he went to the Social Security office (Tr. 396). Prior to that he worked as a dock worker, driver/loader for a carrier company, and as garbage truck driver or loader (Tr. 396-98). He said he has a GED, and completed truck driver training (Tr. 399). He further stated that he stopped working in 2003 (Tr. 400). Plaintiff advised the ALJ that his nerve root pain in his back and depression were the only two conditions that prevent him from working (Tr. 400). When his back pain began, it occurred mostly while he was standing or walking, but he testified the pain then progressed down to his foot, and that it hurts him all the time (Tr. 401-02).

Plaintiff further testified that he obtained treatment from a Dr. VanFleet for several months and was advised that he had three options: (1) oral medications; (2) injections; (3) or surgery (Tr. 404). Plaintiff stated that he tried oral medications, which helped at first; then later tried injections, which helped only for a few days (Tr. 404). Plaintiff said he discussed surgery with Dr. VanFleet, but that he was told it was a complicated surgery that only has a 25 percent chance of improving his symptoms (Tr. 405).

Plaintiff said he moved to Florida to live with his parents in 2005 and started treatment with Southeastern Rehab Medicine in 2006 (Tr. 406-07). More recently, he has been seen by doctors at Shands Hospital (Tr. 408). He stated he has obtained another consultation regarding surgery, but that he was unsure of what to do (Tr. 409).

Plaintiff testified that he also started seeing a doctor at Shands for help with depression (Tr. 410). He was placed on an anti-depressant, Celexa, but learned that two of the medicines he had been taking, Trazodone and Tramadol, did not react well with each other, and he might have to get weaned off one or the other (Tr. 412-13). Plaintiff acknowledged he had a history of depression in 2003 (in Illinois) related to divorce and

6

unemployment (Tr. 414), but noted he did not have a back problem then (Tr. 415). He stated his depression had gotten worse over the last few months (Tr. 415).

Plaintiff testified that he did not seek earlier treatment for depression (in Florida) because of a lack of funds, and not wanting to be a burden on his parents (Tr. 416). Plaintiff stated that a Dr. Fuente discussed vocational rehabilitation with him, but that he thought this would impede his chances of getting disability, and that "[he] wasn't willing to give up on [his] case" (Tr. 418).

Plaintiff acknowledged that he can take care of various activities of daily living, such as changing his clothes, bathing, and washing clothes and dishes, but he also added that he cannot do such activities consistently, without pain, or like a normal person (Tr. 419). He claimed some trouble sleeping (Tr. 419-20). Plaintiff's representative noted he did not drive; however, Plaintiff added that he did not drive because he was not licensed to drive, but that he could physically drive a car (albeit not for long distances) (Tr. 420).

Plaintiff stated that when his depression is bad, he feels "hopeless and dreadful" (Tr. 422). On such days, he stated that he either watches television or does nothing (Tr. 422). He said he was terrified of the thought of surgery and that he has had some thoughts of suicide, but no specific plan (Tr. 423).

The vocational expert, Mr. McKay, acknowledged that Plaintiff could not perform the demands of any of his prior work (Tr. 425-26). The ALJ posed a hypothetical question which provided that Plaintiff could walk, sit, and bend; but not for extended periods of time (Tr. 426). She said Plaintiff could stay seated for less than an hour and then he would need to get up and "move around" (Tr. 426). The ALJ also said Plaintiff would have trouble performing tasks on a consistent and persistent level, or schedule (Tr. 426). The VE stated

that the sit-stand option was not a problem, but that not being able to keep to a schedule might be problematic (Tr. 427).

The ALJ then posed a second hypothetical question, which included a person limited to sedentary or light work activity, with a sit-stand option, and routine simple one or two step tasks—but no specific quota at the end of the day (Tr. 427). The VE then identified positions of small products assembler, lens inserter, and parking lot cashier that the hypothetical individual could perform despite the noted restrictions, *supra* (Tr. 427-28).

### *Medical Evidence*

Plaintiff first sought treatment for back pain at the St. John's Hospital emergency department on April 21, 2004 (Tr. 171-77). During this visit, Plaintiff said he had felt pain off and on for several weeks, and was also involved in an auto-accident that made the pain worse (Tr. 172). Plaintiff also reported that he fell down, which exacerbated his pain (Tr. 172). A spinal x-ray series showed no acute pathology, and hip and pelvis x-rays also were negative (Tr. 173). The radiologist noted significant degeneration of the vertebral bodies and disk space at L5-S1 (Tr. 175). Robert J. Sliwa, D.O. ("Dr. Sliwa") prescribed Skelaxin, a muscle relaxant (Tr. 177).

A few days later, Plaintiff presented to the SIU Center for Family Medicine complaining of left hip pain for several months and foot pain of one to two weeks duration (Tr. 179). He reported no prior back injury (Tr. 179). The doctor found strength and sensation equal bilaterally, normal gait, and a negative Babinski (Tr. 179). The doctor prescribed Elavil (Tr. 179).

Plaintiff was occasionally seen at Central Illinois Allergy and Respiratory Service for respiratory problems in 2003 to 2005 (Tr. 207-18). Glennon H. Paul, M.D. ("Dr. Paul")

provided Plaintiff a prescription for Vicodin in November 2004, February 2005, and May, 2005 (Tr. 209-12). Dr. Paul also prescribed Plaintiff hydrocodone in June 2004 (Tr. 210). Dr. Paul referred Plaintiff to Timothy A. VanFleet, M.D. ("Dr. VanFleet") of the Orthopaedic Center of Illinois, for treatment of his back pain (Tr. 222-37). Dr. Paul's notes reflect that Plaintiff advised Dr. Paul, on April 1, 2005, that Dr. VanFleet did not want to perform surgery, and that he wanted to wean Plaintiff off of Vicodin (Tr. 208).

A MRI of Plaintiff's spine was performed on May 10, 2004 (Tr. 220). This revealed a compression deformity of the L1 vertebral body, a mild diffuse disk bulge at L2-3, a mild diffuse disk bulge at L3-4, a moderate diffuse disk bulge at L4-5, and a moderate diffuse disk bulge with bilateral neural foramina extension and encroachment (Tr. 220).

Dr. VanFleet first examined Plaintiff on June 2, 2004 and found Plaintiff to have a slight antalgic gait favoring his left lower extremity (Tr. 226-27). Dr. VanFleet diagnosed Plaintiff with L5 radiculopathy and recommended an L5 nerve block (Tr. 226-27). Dr. VanFleet prescribed Plaintiff Norco (acetaminophen and hydrocodone) (Tr. 227). Dr. VanFleet wrote Dr. Paul and stated that a surgical discectomy was possible, but that such a procedure would pose a surgical challenge (Tr. 225). Dr. VanFleet also reported that Plaintiff indicated that the Norco was controlling his pain, but that he required it "around the clock" (Tr. 225).

On August 10, 2004, Dr. VanFleet arranged for Plaintiff to receive a lumbar epidural steroid injection for his back pain at Memorial Medical Center (Tr. 197-98). Dr. VanFleet saw Plaintiff again on September 17, 2004, and reported the injection helped considerably and that "he is having much less pain" and "would like to try another injection" (Tr. 223). On September 24, 2004, Dr. VanFleet ordered a second epidural for an L5 nerve root

block, noting that Plaintiff had received some relief with a selective nerve root block injection the month prior (Tr. 191-95). In February 2005, Plaintiff reported continued difficulties with pain and Dr. VanFleet ordered another MRI (Tr. 222).

The MRI was conducted on February 21, 2005 (Tr. 220-21). The report stated that there were stable disk bulges at L4-5 and a diffuse disk bulge at L5-S1, causing bilateral neural foraminal narrowing (Tr. 220-21). Further, a large lateral disk protrusion on the left side caused deviation of the nerve root (Tr. 220-21). The report noted that the changes had progressed since the 2004 MRI (Tr. 221).

Dr. VanFleet saw Plaintiff again on March 19, 2005 (Tr. 219). He reported Plaintiff was taking Vicodin "around the clock" (Tr. 219). Dr. VanFleet advised Plaintiff that the only type of surgery he could successfully perform (due to the location of Plaintiff's injuries) would be a spinal fusion surgery (Tr. 219). Plaintiff advised he wanted to try to discontinue Vicodin in order to see how severe his pain was and, if tolerable, he would elect not to have surgery (Tr. 219).

Subsequently, Plaintiff moved from Illinois to Florida. On April 27, 2005, he visited Zahoor Waseem, M.D. ("Dr. Waseem") In Live Oak, Florida (Tr. 245). Plaintiff requested a prescription for hydrocodone (Tr. 245). He advised Dr. Waseem that Dr. Paul told him to remain on Vicodin until he has back surgery (Tr. 245). Dr. Waseem wrote that Plaintiff did not want a referral to an orthopedic doctor until after he was eligible for Medicaid (Tr. 245). Dr. Waseem provided a refill for hydrocodone, but insisted that Plaintiff sign a contract that he would not get narcotic medications from any other office (Tr. 245; *see also* Tr. 243-44).

By early 2006, Plaintiff was being treated at Southeastern Rehabilitation Medicine in Lake City, Florida (Tr. 316-47).   He was treated monthly from March 23, 2006, through January, 2007 (Tr. 324-47), then every three months (Tr. 316-23).  On the March 23, 2006, visit,[6] Rigoberto Puente-Guzman, M.D. ("Dr. Puente-Guzman") wrote that Plaintiff had returned for pain management for chronic low back pain (346-47).   Plaintiff reported his condition had improved, and that he had "no pain today." (Tr. 346).   Dr. Puente-Guzman wrote that Plaintiff has been "doing better clinically and functionally" (Tr. 346).  Dr. Puente-Guzman continued treatment with Methadone (for pain), Trazadone (an anti-depressant), and Promethazine (for nausea) (Tr. 346).

On April 27, 2006, Dr. Puente-Guzman wrote that Plaintiff appeared in "no acute distress with no demonstrable pain behavior who ambulates to clinic without the use of an assistive device" (Tr. 345).  Plaintiff continued to report lower back and left foot pain (Tr. 344).

On May 24, 2006, Plaintiff reported that his symptoms had increased gradually, with moderate pain with medication, severe pain without (Tr. 341).   Dr. Puente-Guzman observed "no demonstrable pain behavior" (Tr. 342).   Medications were continued (Tr. 343).   On July 20, 2006, Plaintiff reported increased anxiety and depression, and Dr. Puente-Guzman increased Plaintiff's dosage of Trazodone (Tr. 337-38).   On August 17, 2006, Dr. Puente-Guzman again reported "no acute distress" and "no demonstrable pain behavior," stating the majority of the visit was related to depression and counseling (Tr. 335-36).

---

[6]Although this is the first treatment note from Southeastern Rehabilation, it refers to an earlier visit on February 21, 2006, which is not in the record (Tr. 346).

On September 19, 2006, Plaintiff reported some increase in his pain symptoms; however, Dr. Puente-Guzman observed "no acute distress," and that Plaintiff was sitting comfortably throughout the exam without noted increased pain behavior (Tr. 333-34). On November 21, 2006, Plaintiff reported to Dr. Puente-Guzman that Methadone "helps a lot," but that he had read some news stories about the interaction of Methadone and his anti-depressants (Tr. 328). Plaintiff reported that he was independent in activities of daily living and mobility (Tr. 328). Dr. Puente-Guzman wrote that Plaintiff reported "pain in the left low back/hip area diffusely, but I am unable to reproduce it when doing palpation per se" (Tr. 329). Dr. Puente-Guzman stated that the seated leg raise was negative (Tr. 329). Dr. Puente-Guzman also reported that Plaintiff had admitted to his staff of marijuana use and that this caused Dr. Puente-Guzman to have concerns about the "safety and proper usage" of medications and "trust" (Tr. 329).

Plaintiff discussed his application for disability benefits with Dr. Puente-Guzman, and Dr. Puente-Guzman wrote that "based on objective findings, I doubt he will get the Social Security and I have recommended vocational rehab" (Tr. 329-30).

On December 7, 2006, Dr. Puente-Guzman wrote that his plan was to wean Plaintiff off Methadone and that once the current prescription was used it would not be refilled (Tr. 327). Dr. Puente-Guzman indicated he would prescribe a patch related to any withdrawal symptoms (Tr. 327). Dr. Puente-Guzman noted that Plaintiff had not yet established care with a provider for "addiction issues" (Tr. 326).

On January 4, 2007, Plaintiff reported he was taking Methodone only once a day as part of the plan to taper off it (Tr. 324-25). Dr. Puente-Guzman continued to report his observation of "no acute distress" (Tr. 324).

Plaintiff reported, on April 17, 2007, that he needed refills for Tramadol (for pain) and Trazodone and that his pain was under "adequate control" (Tr. 322). Plaintiff was to get a new MRI and see an orthopedic doctor (Tr. 322). In July 2007, Plaintiff advised that he was clinically stable and that the Tramadol was "helping, but not as much as Methodone" (Tr. 320). He reported that after consulting with another doctor he has opted against surgery since he has no "myelopathic findings" (Tr. 320). Plaintiff reported he was functional and independent in all activities of daily living, including driving (Tr. 320).

On October 11, 2007, Plaintiff reported he was taking Tramadol and Trazodone, without side effects (Tr. 318). On January 8, 2008, Plaintiff reported his condition was stable and that this medications continued to be helpful, without side effects (Tr. 316). He said was independent in all activities of daily living, including driving (Tr. 316).

Plaintiff was examined by Michael McMillan, M.D. ("Dr. McMillan") at Shands Healthcare on April 3, 2007 (Tr. 352-53). Dr. McMillan found Plaintiff's back was well aligned and that he had 5/5 strength, intact sensation, and a mildly positive straight-leg raise (Tr. 352). A MRI of April 24, 2007, showed the L3-4 disk and those above it were all normal for Plaintiff's age (Tr. 349). His L4-5 disk showed signs of degeneration with mild posterior protrusion and asymmetric right-side bulging, but without frank nerve-root compression (Tr. 349). At the L5-S1 level there was continued obscuration of the exiting L5 nerve root in the lateral portion of the disk (Tr. 349).

On July 29, 2004, Julio Pardo, M.D. ("Dr. Pardo"), a state medical consultant, completed a physical functional capacity assessment, finding Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, stand for two hours in an eight-hour work day, sit about six hours in an eight-hour work day, and do unlimited pushing and pulling (Tr. 181-88). Dr.

Pardo additionally found, however, that Plaintiff should not climb ladders, ropes or scaffolds, and could only occasionally balance, stoop, kneel, crouch or crawl (Tr. 183).

Using reports from Dr. Waseem and Dr. VanFleet, on July 6, 2005, a DDS physician completed a Residual Functional Capacity Assessment–Physical (Tr. 228-35; *see also* Tr. 3). This physician found Plaintiff could stand or walk for six hours in an eight-hour day, and sit for about six hours (Tr. 229). Two additional physical assessments, one on January 24, 2006 (Tr. 272-82) and the other on December 4, 2007 (Tr. 308-15), were in agreement with the aforementioned limitations. An assessment by Robert Whittier indicated Plaintiff could lift 50 pounds on occasion and 25 pounds frequently (Tr. 309).

A consultive examination by Wayne Sampson, M.D. ("Dr. Sampson"), on November 3, 2007, found Plaintiff had a normal gait, was able to walk on heels and toes, get up from a seated position, and get on and off the examination table without difficulty (Tr. 283-85). Dr. Sampson found Plaintiff's back was not tender and that he had no spasms (Tr. 284). Plaintiff reported that he could walk, sit, bend, stoop, and lift 30-40 pounds, "but [could do] none of those things for an extended period" (Tr. 283).

An earlier consultive examination conducted by Dr. Timothy J. McCormick, D.O., M.P.H. ("Dr. McCormick"), on December 16, 2005, revealed a significant amount of paravertebral tightness, although not tender (Tr. 253-60). Plaintiff's movements were fluid and full, and no neurologic deficits were noted (Tr. 256). Dr. McCormick noted Plaintiff probably functions in a sedentary or light activity level, based on his complaints, and that use of a narcotic medication would be necessary to maintain a functional level (Tr. 256).

Psychiatrist, Andres Nazario, Jr., Ph.D. ("Dr. Nazario"), performed a general clinical evaluation with mental status on December 6, 2005 (Tr. 248-52), concluding Plaintiff's

presentation and records were consistent with an adjustment disorder with mixed anxiety and depressed mood, chronic (Tr. 250). Dr. Nazario noted Plaintiff had just began seeing a pain management doctor the prior week and that his medications had just been changed (Tr. 250). Dr. Nazario found Plaintiff capable of managing his own financial affairs (Tr. 250). Dr. Nazario also found Plaintiff could concentrate, understand and follow directions, and interact with others appropriately (Tr. 250).

Another mental health evaluation was conducted on November 12, 2007, by Chris J. Carr, Ph.D. ("Dr. Carr") (Tr. 289-293). Dr. Carr noted a history of depression from about 2000 that "waxed and waned depending on stressors" (Tr. 292). He found depression due to a medical disorder, but noted Plaintiff could manage his own affairs (Tr. 292).

Thomas L. Clark, Ph.D. ("Dr. Clark") completed a psychiatric review technique on November 30, 2007 (Tr. 294-307), concluding an affective disorder (depression), not severe (Tr. 294). Dr. Clark found no restrictions on activities of daily living, mild restrictions in maintaining social functioning and maintaining concentration, persistence and pace, and no episodes of decompensation (Tr. 304). Dr. Clark reported Plaintiff's mental illness was not severely limiting (Tr. 306).

### *Plaintiff's Arguments*

In lay fashion, Plaintiff raises several objections to the decision of the ALJ.

1. Plaintiff claims insufficient medical opinions were brought forward on his behalf, and that his lack of financial resources prevented him from presenting any doctor testimony (Doc. #1 at 1).

Plaintiff fails to state a basis, however, for what medical opinions or testimony were missing or would have been offered. As of September 2006, Plaintiff reported to his

15

physician that he was on Medicaid (Tr. 333). Plaintiff was represented by counsel (albeit by a non-attorney representative from the law firm at the hearing). The file contains Plaintiff's medical records going back many years, as well as several consultative mental and physical evaluations and assessments by DDS personnel. None of Plaintiff's treating physicians have found him to be disabled. Plaintiff appears to consider the proceedings as a more akin to a tort law suit than a non-adversary proceeding (as provided under the Regulations).

An ALJ has a duty to develop the record, regardless of whether a claimant is represented by counsel. *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995). However, before a court can find that a claimant's right to due process has been violated by a failure to develop the record, the claimant must show prejudice. *Brown*, 44 F.3d at 935 (*citing Kelley v. Heckler,* 761 F.2d 1538, 1540 (11th Cir. 1985). In making that determination, the court should be guided by whether the record reveals evidentiary gaps which result in unfairness or "clear prejudice." *Graham v. Apfel,* 129 F.3d 1420, 1423 (11th Cir. 1997).

At the hearing, the ALJ asked Plaintiff's representative at the end of the questioning of both Plaintiff and the VE whether she had any questions (Tr. 423, 428). The ALJ also asked if there were any other records or exhibits, and allowed the representative two weeks to provide any such additional records (Tr. 392-93).

Plaintiff does not point to any missing records, but rather claims vaguely that he did not have enough money to "acquire a physician willing to become involved with my Disability Litigation in the form of testimony or deposition due to my inability to compensate them for the[ir] valuable time" (Doc. #1 at 1).

16

Plaintiff was represented by a law firm. It is the claimant who bears the burden of proving he or she is disabled and, therefore, is responsible for producing evidence to support the claim. *See Bowen*, 482 U.S. at 146 n. 5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). There is no evidence to support any claim of error on the part of the ALJ as to the receipt of evidence in the case. Social Security administrative hearing proceedings are non-adversarial and informal in nature. 20 C.F.R. § 404.900(b); *Ware v. Schweiker*, 651 F.2d 408, 413 (5th Cir. 1981).

As stated in *Smith v. Schweiker*,

We [the Eleventh Circuit] are concerned not so much with whether every question was asked which might have been asked had [the plaintiff] been represented by an attorney, as we are with whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.' Claimant's proffer of prejudice amounts to no more than speculations on ways in which an attorney could have bolstered his credibility before the ALJ. Although it is true, as the claimant asserts, that an attorney may have qualified some of the ALJ's questions, the record as a whole reveals that no relevant facts, documents, or other evidence were omitted from the ALJ's consideration or his findings.

677 F.2d 826, 829 (11th Cir. 1982).

Here, as in *Smith*, at no point can the Court find Plaintiff was prejudiced by his lack of an attorney representative at the hearing.

2. Plaintiff also takes exception with the ALJ's statement that "the medical evidence fails to establish an underlying medical condition that could reasonably be expected to produce incapacitating pain" (Doc. #1 at 2).

17

The ALJ first acknowledged that the medically determinable impairments could "reasonably be expected to produce the alleged symptoms," that is, pain resulting from the back impairment (Tr. 19). However, the ALJ found for the several reasons she listed that Plaintiff's statements as to the extent of the "intensity, persistence and limiting effects" of his symptoms were not credible to the extent he claims he is precluded from "*all* work activity" (Tr. 19) (*emphasis added*).

The Regulations provide that a claimant's statements about pain or other symptoms will not alone establish disability. 20 C.F.R. §§ 404.1529; 416.929 Rather, medical signs and laboratory findings must be present to show a medical impairment that could reasonably be expected to produce the symptoms alleged.

Under the Eleventh Circuit pain standard, the claimant must provide evidence of an underlying medical condition and must produce objective medical evidence confirming the severity of the alleged pain **or** evidence that the determined medical condition is of the severity which can reasonably be expected to give rise to the degree of pain or symptoms alleged. *Foote v. Chater*, 67 F.3d 153, 1560 (11th Cir. 1995); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986).

As noted in *Landry,* whether objective medical impairments could reasonably give rise to the alleged pain is a question of fact for the Commissioner, "subject only to limited review in the courts to ensure that the finding is supported by substantial evidence." *Landry*, 782 F.2d at 1553. The ALJ noted that if a claimant's statements about the intensity, persistence or limiting effects of pain are not substantiated by objective medical evidence, she must make a finding on the credibility of the statements based on a consideration of the record in its entirety (Tr. 18). In so doing, she considered the factors listed in 20

C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3); *see also Macia v. Bowen*, 829 F.2d 1009 (11th Cir. 1987).

Here, the ALJ did not "reject" Plaintiff's allegations, but determined Plaintiff's subjective allegations were not fully credible to the extent they preclude **all** work activity (Tr. 19). In support of this determination, the ALJ cited the following factors: (1) Plaintiff has refused to undergo surgery; (2) his condition has been treated with medication and injections (which he reported improved his pain symptoms); (3) during most examinations his gait was normal; (4) consultative examiners reported only minimal findings; (5) none of Plaintiff's treating physicians reported that he is completely unable to perform work activity; (6) Plaintiff declined to go to vocational rehabilitation; (7) consultive examiner, Dr. McCormick, stated Plaintiff was functioning at the sedentary to light activity level (Tr. 19); (8) consulting psychiatrist, Dr. Nazario, said claimant was able to concentrate, understand and follow directions, and appeared able to interact with others appropriately; and (9) Plaintiff's inconsistent statements about activities of daily living (Tr. 19).

Plaintiff particularly objects to the findings concerning his refusal to undergo surgery and that he could drive a vehicle (Doc. #1 at 2). Plaintiff claims he has not ruled out surgery, but has been told it is not a routine surgery and could actually worsen his condition. Nonetheless, the Eleventh Circuit has found that conservative treatment can provide substantial evidence to support a finding a not disabled. *Wolfe v. Chater*, 86 F.3d 1072 (11th Cir. 1996).

Plaintiff also claims his ability to drive a car should not be used against him since "many disabled persons drive cars" (Doc. #1 at 2). During his testimony, Plaintiff

volunteered the statement that "I could physically drive a car" during a discussion of whether he had a license (Tr. 420). Plaintiff added he could not drive the distances he used to, but that he could physically get in a car and drive, such as to the store (Tr. 420). Dr. Puente-Guzman reported on January 4, 2007 that Plaintiff was independent in mobility and activities of daily living, including driving (Tr. 324).

In *Allen v. Sullivan*, 880 F.2d 1200, 1203 (11th Cir. 1989), the Eleventh Circuit found that where the administrative law judge has specifically articulated at least three reasons for rejecting the claimant's subjective complaints of pain, he or she properly discredits such testimony. Even if the ALJ's statements about surgery and driving a car are eliminated, there are still seven other articulated reasons remaining as to why the ALJ discredited Plaintiff's claim that his pain is totally debilitating. As provided herein, the ALJ's cited reasons for discounting Plaintiff's allegations of disabling pain is supported by substantial evidence. A reviewing court will not disturb a clearly articulated finding with substantial evidence in the record. *Foote,* 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

3. Third, Plaintiff claims the ALJ discounted the effects of his depression. Here, at the second step of the five-step sequential evaluation process, required under 20 C.F.R. § 1505,[7] the ALJ considered Plaintiff's claim of depression, citing the consultive

---

[7]At step one, the ALJ found the Plaintiff had not engaged in substantial gainful activity since April 1, 2004, the alleged onset date (Tr. 15). At step two, the ALJ found multilevel degenerative disc disease with disc herniation as a severe impairment (Tr.15). At step three, the ALJ found the Plaintiff did not have an impairment or combination of impairments that met or medically equaled of the listed impairments in Appendix 1, Subpart P of the Regulations (Tr. 18). At step four, the ALJ found Plaintiff is unable to perform any past relevant work (Tr. 20). At step five, the ALJ found that considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform (Tr. 20).

examinations by Dr. Nazario and Dr. Carr (Tr. 17). The ALJ then found the medically determinable impairment of depression did not cause more than minimal limitation in his ability to perform basic work activities; thus, she found it was not severe (Tr. 17).

In making this finding, the ALJ properly performed the psychiatric function review technique required by the disability regulations for evaluating mental disorders. *See* 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1); the Listing of Impairments, 20 C.F.R., Part 404, Subpart B, Appendix 1 (known as the "paragraph B" criteria). In the four broad functional areas, the ALJ found that Plaintiff has only mild limitations in activities of daily living, social functioning, and in maintaining concentration, persistence or pace. She additionally found no episodes of decompensation (Tr. 17).

Under the Regulations, if a claimant's mental impairment(s) cause no more than mild limitations in the three functional areas listed above and "no" episodes of decompensation, they are to be considered non-severe. 20 C.F.R. §§ 404.1520a(d)(1); 416.920a(d)(1).

The ALJ also considered the effects of Plaintiff's depression at step four of the sequential evaluation process. The ALJ cited Dr. Nazario's report that Plaintiff was able to concentrate, understand and follow directions, and appeared to be able to interact with others appropriately (Tr. 19). She noted that Plaintiff's depression has been treated by medication (Tr. 18), a limited mental health treatment (Tr. 19). As stated previously, the Court finds the ALJ provided sufficient reasons to discount Plaintiff's credibility with respect to his claim of debilitating pain and depression.

The ALJ further took into account Plaintiff's claims of mental difficulties in his question to the vocational expert by limiting his functional capacity to "routine, simple, one-two tasks" and working with "things instead of people" (Tr. 427).

21

Although the Court of Appeals for the Eleventh Circuit has not directly addressed this specific issue, case law from other circuit courts of appeals, which the undersigned finds persuasive, supports the notion that claimants with mild to moderate deficits in concentration, persistence or pace can perform low stress, simple, routine, or semi-skilled work. *See Smith v. Halter*, 307 F.3d 377, 378-79 (6th Cir. 2001) (finding hypothetical limiting plaintiff to jobs that are "routine and low stress" adequately accounted for plaintiff's "'often' deficiencies in concentration, persistence, or pace"); *Jens v. Barnhart*, 347 F.3d 209, 212-13 (7th Cir. 2003) (finding plaintiff capable of semiskilled work even though he "often" had "deficiencies of concentration, persistence, or pace"); *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002) (deeming acceptable an ALJ's RFC assessment which provided that the plaintiff could perform "repetitive, low-stress work" even though he had "moderate" mental limitations); *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) (finding "ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures [plaintiff's] deficiencies in concentration, persistence, or pace").

## CONCLUSION

Upon due consideration, the undersigned finds the decision of the Commissioner was decided according to proper legal standards and is supported by substantial evidence. As neither reversal nor remand is warranted in this case, and for the aforementioned reasons, the decision of the ALF is hereby **AFFIRMED** pursuant sentence four of 42 U.S.C. Section 405(g). The Clerk of the Court is directed to enter judgment consistent with this ruling and, thereafter, to close the file. Each party shall bear its own fees and costs.

**DONE AND ORDERED** at Jacksonville, Florida this  29th  day of March, 2010.


Copies to all counsel of record
and *pro se* Plaintiff

**THOMAS E. MORRIS**
United States Magistrate Judge